No. 22-1568

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ADVANCED INTEGRATIVE MEDICAL SCIENCE INSTITUTE,
PLLC, *et al.*,

Petitioners,

v.

UNITED STATES DRUG ENFORCEMENT ADMINISTRATION,

Respondent.

On Petition for Review of a Decision of the United States Drug
Enforcement Administration

## BRIEF FOR RESPONDENT

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

MARK B. STERN
THOMAS PULHAM
*Attorneys, Appellate Staff*
*Civil Division, Room 7323*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4332*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................... 1

STATEMENT OF JURISDICTION ........................................... 2

STATEMENT OF THE ISSUES ............................................... 2

PERTINENT STATUTES AND REGULATIONS ..................... 3

STATEMENT OF THE CASE .................................................. 3

    A.    Statutory Background ................................................. 3

        1.    The Controlled Substances Act ..................... 3

        2.    The Federal Food, Drug, and Cosmetic Act ................. 8

        3.    The Right to Try Act ..................................... 12

    B.    Factual and Procedural Background ..................... 14

SUMMARY OF ARGUMENT .................................................. 19

STANDARD OF REVIEW ....................................................... 22

ARGUMENT ........................................................................... 23

I.    DEA Correctly Explained that the Right to Try Act Does Not Waive the Prohibitions of the CSA or Authorize DEA to Do So. ....................................................................................... 23

    A.    The Right to Try Act Does Not Affect CSA Registration Requirements. ...................................... 23

    B.    Petitioners Identify No Error in DEA's Legal Analysis. ...... 26

II.     DEA Reasonably Declined to Initiate a Rulemaking to Waive the CSA's Registration Requirement to Permit Dispensing Psilocybin for Therapeutic Purposes. ...............................................35

        A.     DEA Concluded that the Petition Was Inadequate and that the Requested Waiver Would be Inconsistent with Public Health and Safety. ......................................................36

        B.     Petitioners Fail to Carry Their Heavy Burden to Require DEA to Engage in Rulemaking. ............................40

CONCLUSION ........................................................................48

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*Abigail All. For Better Access to Developmental Drugs v.*
*von Eschenbach,*
  495 F.3d 695 (D.C. Cir. 2007) .................................................. 8, 10, 11

*Advanced Integrative Med. Sci. Inst., PLLC v. Garland,*
  24 F.4th 1249 (9th Cir. 2022) ....... 16, 17, 20, 23, 24, 25, 26, 27, 28, 32

*Aggarwal v. U.S. DEA,*
  No. 22-1718, 2023 WL 7101927 (9th Cir. Oct. 27, 2023),
  *petition for reh'g denied* (9th Cir. Dec. 12, 2023) ................................ 5

*Artichoke Joe's Cal. Grand Casino v. Norton,*
  353 F.3d 712 (9th Cir.2003) ................................................................ 31

*Carcamo-Recinos v. Ashcroft,*
  389 F.3d 253 (1st Cir. 2004) .............................................................. 41

*Compassion Over Killing v. U.S. FDA,*
  849 F.3d 849 (9th Cir. 2017) .................................................. 23, 36, 38

*Fry v. DEA,*
  353 F.3d 1041 (9th Cir. 2003) ............................................................ 22

*Environmental Def. Fund v. EPA,*
  922 F.3d 446 (D.C. Cir. 2019) ............................................................ 45

*Epic Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018) ............................................................................ 28

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) .............................................................................. 8

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
  546 U.S. 418 (2006) .......................................................... 34, 39, 42, 43

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ............................................................................ 33

*Gonzales v. Raich,*
  545 U.S. 1 (2005) ................................................................................ 31

iii

*Greenwood v. FAA,*
   28 F.3d 971 (9th Cir. 1994) ............................................... 40

*Kuromiya v. United States,*
   78 F. Supp. 2d 367 (E.D. Pa. 1999) ................................ 44

*Lin v. Garland,*
   No. 19-71623, 2023 WL 3055283 (9th Cir. Apr. 24, 2023) ............... 41

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ........................................... 36, 38

*McFarland v. Kempthorne,*
   545 F.3d 1106 (9th Cir. 2008) ........................................ 47

*Mendez-Alcaraz v. Gonzales,*
   464 F.3d 842 (9th Cir. 2006) ......................................... 41

*Morton v. Mancari,*
   417 U.S. 535 (1974) .................................................. 27

*Murrell v. Shalala,*
   43 F.3d 1388 (10th Cir. 1994) ........................................ 41

*Motor Vehicle Mfrs Ass'n of the U.S. v. State Farm Mut.*
   *Auto. Ins. Co.,*
   463 U.S. 29 (1983) ................................................... 47

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*
   795 F.3d 956 (9th Cir. 2015) ......................................... 47

*Posadas v. National City Bank of N.Y.,*
   296 U.S. 497 (1936) ................................................. 27

*Rodriguez-Hernandez v. Garland,*
   89 F.4th 742 (9th Cir. 2023) ......................................... 40

*United States v. Canori,*
   737 F.3d 181 (2d Cir. 2013) .......................................... 31

*United States v. Moore,*
   423 U.S. 122 (1975) ................................................ 4, 32

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001) ...................................................... 6, 23

*Wedgewood Vill. Pharmacy v. DEA*,
  509 F.3d 541 (D.C. Cir. 2007) .................................... 4

*Weston v. Lockheed Missiles & Space Co.*,
  881 F.2d 814 (9th Cir. 1989) ...................................... 41

**Statutes:**

Administrative Procedure Act (APA):
  5 U.S.C. § 551 *et seq.* .............................................. 22
    5 U.S.C. § 555(e) ..................................................... 45
    5 U.S.C. § 706(2)(A) ................................................ 23

Controlled Substances Act (CSA):
  21 U.S.C. § 801 *et seq.* ............................................ 3
    21 U.S.C. § 802 ....................................................... 4
    21 U.S.C. § 802(21) .................................................. 6
    21 U.S.C. § 811 ....................................................... 5
    21 U.S.C. § 812 ....................................................... 5
    21 U.S.C. § 812(a)-(b) .............................................. 4
    21 U.S.C. § 812(b) .................................................. 15
    21 U.S.C. § 812(b)(1) ...................... 1, 4, 18, 38, 39, 43, 46
    21 U.S.C. § 812(b)(2)-(5) .......................................... 4
    21 U.S.C. § 812(c) ................................................... 5
    21 U.S.C. § 812 sched. I(c)(15) .................................. 5
    21 U.S.C. § 822 ...................................................... 35
    21 U.S.C. § 822(a) ................................................... 34
    21 U.S.C. § 822(a)(2) ...................................... 5, 23, 31
    21 U.S.C. § 822(b) ..................................... 6, 23, 30, 32
    21 U.S.C. § 822(d) ..................... 7, 16, 17, 34, 35, 38, 43
    21 U.S.C. § 823(f) (2021).................. 6, 7, 24, 28, 29, 32, 35
    21 U.S.C. § 823(g)(2)(A) ........................................... 6
    21 U.S.C. § 823(g)(2)(B)(i)(I) .................................. 29
    21 U.S.C. § 824(a) ................................................... 7
    21 U.S.C. § 841(a) ................................................... 3
    21 U.S.C. § 844(a) ................................................... 4

21 U.S.C. § 877 ................................................................ 2
21 U.S.C. § 902 .............................................................. 26

Federal Food, Drug, and Cosmetic Act (FDCA):
21 U.S.C. § 331 ............................................................... 8
21 U.S.C. § 355(a) ........................................................... 8
21 U.S.C. § 355(b) ........................................................... 8
21 U.S.C. § 355(d) ........................................................... 8
21 U.S.C. § 355(i) ....................................................... 9, 28

Medical Marijuana and Cannabidiol Research Expansion Act,
Pub. L. No. 117-215, tit. I, §§ 101, 103,
136 Stat. 2257, 2258-59, 2261-63 (2022) ................................. 6

Omnibus Consolidated and Emergency Supplemental
Appropriations Act, 1999,
Pub. L. No. 105-277, div. F, 112 Stat. 2681, 2681-760 (1998) .............. 5

Trickett Wendler, Frank Mongiello, Jordan McLinn, and
Matthew Bellina Right to Try Act of 2017,
Pub. L. No. 115-176, 132 Stat. 1372 (2018) ........................ 12
§ 1 .................................................................. 12
§ 3(1) ............................................................... 14
§ 3(3) ............................................................... 14
§ 3(4) ............................................................... 14
21 U.S.C. § 360bbb ............................................... 11
21 U.S.C. § 360bbb-0a(a)(1) ..................................... 13
21 U.S.C. § 360bbb-0a(a)(2) ............................... 13, 25
21 U.S.C. § 360bbb-0a(b) ..................... 12, 24, 25, 27, 32
21 U.S.C. § 360bbb-0a(d) ........................................ 13

42 U.S.C. § 2000bb-1(b) ............................................ 43

**Regulations:**

21 C.F.R. § 300.200(b)-(c) ....................................... 14

21 C.F.R. pt. 312 .............................................. 9, 28
21 C.F.R. § 312.7 .............................................. 12

vi

21 C.F.R. § 312.21 .................................................... 9
21 C.F.R. § 312.21(a)(1) ........................................ 9
21 C.F.R. § 312.21(b) ............................................ 9
21 C.F.R. § 312.21(c) ............................................ 9
21 C.F.R. pt. 312, subpt. I .................................. 11
   21 C.F.R. §§ 312.300-.305 ............................. 11

21 C.F.R. § 314.50(d)(5) ....................................... 8

21 C.F.R. § 600.3 ................................................... 11

21 C.F.R. § 1300.01 .............................................. 46

21 C.F.R. § 1301.18 .............................................. 7

21 C.F.R. § 1301.22 .............................................. 7

21 C.F.R. § 1301.22(c) ......................................... 40

21 C.F.R. § 1301.24 .............................................. 7

21 C.F.R. § 1301.24(a)(2) ..................................... 40

21 C.F.R. § 1301.31 .............................................. 7

21 C.F.R. § 1301.32 .......................................... 7, 24

21 C.F.R. § 1307.03 .................................. 18, 36, 42

21 C.F.R. § 1307.31 .............................................. 40

21 C.F.R. § 1308.43(b) ......................................... 37

21 C.F.R. § 1316.24 .............................................. 16

## Legislative Material:

Cong. Research Serv., Bill Summary, H.R. 8454,
   117th Cong. (2022), https://www.congress.gov/bill/117th-
   congress/house-bill/8454 ................................. 29

vii

**Other Authorities:**

AIMS Inst., *Integrative Oncology*,
   https://perma.cc/4FWR-95AH ...................................................... 14

DEA, *Psilocybin*, https://perma.cc/6U9D-XBWG ............................... 15

FDA*, Expanded Access*, https://perma.cc/5VC4-U44A ........................... 11

FDA, *Expanded Access Program Report* (May 2018),
   https://www.fda.gov/media/119971/download .................................... 11

FDA, *Right to Try*, https://perma.cc/S9V5-9EW5 .................................. 13

68 Fed. Reg. 58587 (Oct. 10, 2003) ..................................................... 33

70 Fed. Reg. 11695 (Mar. 9, 2005) ..................................................... 33

Peter D. Jacobson & Wendy E. Parmet,
   *A New Era of Unapproved Drugs: The Case of Abigail*
   *Alliance v. von Eschenbach*, 297 JAMA 205 (2007) ........................... 10

## INTRODUCTION

Psilocybin is a hallucinogenic drug found in certain mushrooms. When Congress enacted the Controlled Substances Act (CSA), it placed psilocybin in the statute's most restrictive category, finding that the drug had "no currently accepted medical use in treatment in the United States" and "a lack of accepted safety for use . . . under medical supervision." 21 U.S.C. § 812(b)(1). As a result, psilocybin may only be dispensed by registered medical practitioners as part of a research project approved by the Food and Drug Administration (FDA). It may not be prescribed for therapeutic use.

Petitioners Dr. Sunil Aggarwal and Advanced Integrative Medical Science Institute, PLLC (AIMS Institute), want to use psilocybin in the treatment of depression in terminally ill cancer patients. They petitioned the Drug Enforcement Administration (DEA) for authorization to obtain the drug for therapeutic use under two theories. First, petitioners contended that access to the drug was permitted under the Right to Try Act, a federal law that "exempts investigational drugs from the FDA's premarketing approval requirements." 2-ER-15. Second, petitioners asked in the alternative that DEA conduct a

rulemaking under 21 U.S.C. § 822(d) to waive the CSA's registration requirement that prevents physicians from dispensing schedule I substances for therapeutic use.

The agency explained that the Right to Try Act does not exempt a physician from the requirements of the CSA, and it declined to initiate a rulemaking to waive the registration requirement applicable to psilocybin. DEA's action was neither contrary to law nor arbitrary and capricious. The petition for review should be denied.

## STATEMENT OF JURISDICTION

On August 19, 2022, DEA denied petitioners' request for authorization to obtain psilocybin, a schedule I controlled substance. 1-ER-6-8. Petitioners filed a timely petition for review on September 19, 2022. 1-ER-3. This Court has jurisdiction under 21 U.S.C. § 877.

## STATEMENT OF THE ISSUES

The issues presented on appeal are:

1. Whether DEA's conclusion that the Right to Try Act does not waive CSA requirements or give DEA authority to do so is arbitrary and capricious or contrary to law.

2

2.  Whether DEA's decision not to initiate a rulemaking to waive the CSA's registration requirement and permit petitioners to dispense psilocybin for therapeutic use is arbitrary and capricious, an abuse of discretion, or otherwise contrary to law.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

This case concerns the intersection of three federal laws regulating the distribution and use of drugs in the United States: the CSA; the Federal Food, Drug, and Cosmetic Act; and the Right to Try Act.

### 1.    The Controlled Substances Act

The CSA, 21 U.S.C. § 801 *et seq.*, establishes a comprehensive federal scheme for the regulation of dangerous drugs.  It is unlawful under that scheme to manufacture, distribute, dispense, or possess any controlled substance, except as expressly authorized.  *Id.* §§ 841(a)(1),

844(a).[1]  The CSA thus establishes a "closed system of distribution," *Wedgewood Vill. Pharmacy v. DEA*, 509 F.3d 541, 542 (D.C. Cir. 2007) (quotation marks omitted), authorizing certain transactions "within the legitimate distribution chain and mak[ing] all others illegal," *United States v. Moore*, 423 U.S. 122, 141 (1975) (quotation marks omitted).

The CSA classifies controlled substances into five separate schedules based on their potential for abuse, medical uses, and risk of physical or psychological dependence.  21 U.S.C. § 812(a)-(b).  It then imposes varying restrictions on each listed substance depending on the applicable schedule.  Substances in schedule I—the most restricted schedule—have "a high potential for abuse," "no currently accepted medical use in treatment in the United States," and "a lack of accepted safety for use . . . under medical supervision."  *Id.* § 812(b)(1).  By contrast, drugs listed in schedules II through V have accepted medical uses and decreasing risk of abuse and dependence.  *Id.* § 812(b)(2)-(5).

When the CSA was enacted in 1970, Congress made an initial assignment of controlled substances to the schedules, as it found

---

[1] A "controlled substance" is "a drug," as defined under the Federal Food, Drug, and Cosmetic Act, "or other substance, or immediate precursor" listed on one of five schedules.  21 U.S.C. § 802.

4

appropriate.  21 U.S.C. § 812(c).  Congress placed psilocybin in schedule I.  *Id.* § 812 sched. I(c)(15).[2]  The CSA authorizes the Attorney General, in consultation with the Secretary of Health and Human Services, to add or remove substances or to transfer substances from one schedule to another based upon statutory criteria that take into account changes in medical and scientific understanding and shifts in patterns of abuse. *Id.* §§ 811, 812.[3]

To dispense controlled substances lawfully, a physician must "obtain from the Attorney General a registration."  21 U.S.C. § 822(a)(2).  Registered physicians may dispense controlled substances

---

[2] In 1998, Congress passed a resolution reaffirming that the drugs "listed on Schedule I of the Controlled Substances Act . . . have a high potential for abuse, lack any currently accepted medical use in treatment, and are unsafe, even under medical supervision."  Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, div. F, 112 Stat. 2681, 2681-760 (1998).  Congress also expressed its "continue[d]" "support [for] the existing Federal legal process for determining the safety and efficacy of drugs and oppose[d] efforts to circumvent this process" and to establish legal uses for schedule I drugs "without valid scientific evidence."  *Id.* at 2681-761.

[3] Petitioners have separately asked DEA to transfer psilocybin from schedule I to schedule II.  That petition is currently before the agency.  *See Aggarwal v. U.S. DEA*, No. 22-1718, 2023 WL 7101927 (9th Cir. Oct. 27, 2023) (remanding the petition to the agency for further action), *petiton for reh'g denied* (9th Cir. Dec. 12, 2023).

5

only "in the course of professional practice or research," *id.* § 802(21), and only "to the extent authorized by their registration and in conformity with the other provisions of [the CSA]," *id.* § 822(b).  The only registrations permitted for schedule I substances are for *bona fide* research.  *Id.* § 823(f) (2021).[4]  Thus, "[u]nlike drugs in other schedules, schedule I drugs cannot be dispensed under a prescription."  *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 492 n.5 (2001) (citation omitted).

When a practitioner "wishing to conduct research with controlled substances in schedule I" applies for a researcher registration under § 823(f), DEA refers the application to the Secretary of Health and Human Services, "who shall determine the qualifications and competency of each practitioner requesting registration, as well as the merits of the research protocol."  21 U.S.C. § 823(f) (2021); *see also*

---

[4] Following an amendment to the CSA in late 2022, this limitation is currently located at 21 U.S.C. § 823(g)(2)(A).  *See* Medical Marijuana and Cannabidiol Research Expansion Act, Pub. L. No. 117-215, tit. I, §§ 101, 103, 136 Stat. 2257, 2258-59, 2261-63 (2022).  That amendment added new provisions regarding registrations for marijuana research but did not change the language that limited registrations to dispense schedule I substances to approved research projects.  Because petitioners' brief and materials in the administrative record refer to a prior version of § 823(f), this brief will do so also.

6

21 C.F.R. §§ 1301.18, 1301.32.  An application under this provision submitted by "a practitioner deemed qualified by the Secretary" may only be denied by DEA on limited grounds specified by the CSA. 21 U.S.C. §§ 823(f) (2021), 824(a).

The CSA prescribes a specific procedure for creating exemptions from its registration requirements.  Section 822(d) provides that DEA "may, by regulation, waive the requirement for registration of certain manufacturers, distributors, or dispensers if [the agency] finds it consistent with the public health and safety." 21 U.S.C. § 822(d).  For example, the agency has adopted rules that permit law enforcement officials to possess controlled substances in the course of their official duties and practitioners who work at a hospital to dispense controlled substances under the registration of their employer rather than obtain an individual registration.  21 C.F.R. §§ 1301.22, 1301.24.  Members of the Native American Church have also been exempted from registration with respect to "the nondrug use of peyote in bona fide religious ceremonies."  *Id.* § 1307.31.

## 2.    The Federal Food, Drug, and Cosmetic Act

The Federal Food, Drug, and Cosmetic Act (FDCA) imposes substantive restrictions on the distribution of all drugs, not only those designated as controlled substances.  *See* 21 U.S.C. § 331.  One of the FDCA's "core objectives" is to ensure that any drug used in the United States is "safe and effective for its intended purpose."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 134 (2000).  To that end, the statute generally prohibits the introduction into interstate commerce of new drugs unless and until they have been approved by FDA.  21 U.S.C. § 355(a); *see also Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 697 (D.C. Cir. 2007).

To approve a new drug, FDA must determine that the drug is "safe and effective" for each of is intended uses.  21 U.S.C. § 355(a), (b), (d).  Clinical testing on humans is generally a prerequisite for the approval of a new drug application.  21 C.F.R. § 314.50(d)(5).  But before such testing can begin, the drug's sponsor must submit an investigational new drug (IND) application describing the protocols for

8

planned studies and establishing that human testing is appropriate. *See generally* 21 U.S.C. § 355(i); 21 C.F.R. pt. 312.

FDA regulations prescribe a three-phase process for the clinical testing of a new drug for safety and effectiveness. 21 C.F.R. § 312.21. Phase 1 involves the initial introduction of the new drug into a small number of human subjects (typically 20 to 80) and is "designed to determine the metabolism and pharmacologic actions of the [new] drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness." *Id*. § 312.21(a)(1). Phase 2 involves a well-controlled, closely monitored study of the drug in a small group of patients (usually no more than several hundred) to evaluate "the effectiveness of the drug for a particular indication" and "to determine [its] common short-term side effects and risks." *Id*. § 312.21(b). Phase 3 involves large clinical trials (of several hundred to several thousand subjects) designed to gather "additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." *Id*. § 312.21(c).

9

That a clinical trial is allowed to proceed from Phase 1 to subsequent phases does not represent a judgment by FDA that the investigational drug is either safe or effective for use in treating diseases. Preliminary expectations of safety and efficacy often prove to be unfounded, and drugs that initially appear to be promising are frequently revealed to be ineffective or even affirmatively harmful. *See Abigail Alliance*, 495 F.3d at 706 n.11 (describing "numerous examples" in which trials have been ended in later phases because "those taking the drug[s] were dying at a greater rate than those taking a placebo"). Successful clinical trials are the exception, not the rule, as "the great majority of experimental drugs ultimately provide no benefit." *Id.* at 708 n.15. For example, only 5% of all cancer drugs that begin clinical testing are ultimately approved for patient use, and even among cancer drugs that successfully complete Phase 1 testing, less than a third proceed from Phase 2 to Phase 3. *Id.* (citing Peter D. Jacobson & Wendy E. Parmet, *A New Era of Unapproved Drugs: The Case of Abigail Alliance v. von Eschenbach*, 297 JAMA 205, 206 (2007)).

In some circumstances, when other treatments are unavailing, patients may seek access to investigational drugs outside of the clinical

10

trial process using the FDA "expanded access" program. *See* 21 U.S.C. § 360bbb; 21 C.F.R. pt. 312, subpt. I; *see also Abigail Alliance*, 495 F.3d at 698-99. These expanded access procedures may permit a patient with an "immediately life-threatening" or "serious" disease or condition to gain access to an investigational product outside of a clinical trial when no comparable or satisfactory alternative therapy options are available. 21 C.F.R. §§ 312.300-.305. *See generally* FDA*, Expanded Access*, https://perma.cc/5VC4-U44A. FDA receives approximately 1,800 requests each year for expanded access to investigational products, and it authorizes 99% of those requests. FDA, *Expanded Access Program Report* 5, 14 (May 2018), https://www.fda.gov/media/119971/download. Despite this high volume, emergency requests for single patients are typically reviewed in less than one day, and non-emergency requests for single patients seeking access to investigational drugs are typically resolved in approximately eight days. *Id.* at 14-15.[5] FDA's role in reviewing expanded access requests permits the agency to ensure that

---

[5] Requests for access to substances classified as "biological products," 21 C.F.R. § 600.3, take longer to resolve. FDA, *Expanded Access Program Report* 14-15.

11

patient safety is protected, including by requiring changes to the treatment protocol or strengthening informed consent where necessary.

### 3. The Right to Try Act

In 2018, Congress enacted the Right to Try Act,[6] Pub. L. No. 115-176, 132 Stat. 1372 (2018), which amended the FDCA to provide a new pathway by which certain patients might be able to access certain unapproved medical products. The Right to Try Act provides that "[e]ligible investigational drugs provided to eligible patients in compliance with this section are exempt from" specified statutory and regulatory provisions governing the labeling, approval, and clinical trials of drugs. 21 U.S.C. § 360bbb-0a(b). Other regulations, including those that forbid promoting, commercially distributing, or test marketing investigational drugs, still apply. *Id.* (requiring compliance with 21 C.F.R. § 312.7).

An "eligible investigational drug" is a drug that (1) is not approved or licensed by FDA for any use, (2) has been the subject of a Phase 1 clinical trial, (3) is the subject of a new drug application filed with FDA

---

[6] The full name of the Act is the "Trickett Wendler, Frank Mongiello, Jordan McLinn, and Matthew Bellina Right to Try Act of 2017." *See* Pub. L. No. 115-176, § 1, 132 Stat. at 1372.

12

(meaning clinical trials have been completed) or is the subject of an active investigational new drug application and is currently under investigation in a clinical trial, and (4) is under active development or production and was not discontinued by the manufacturer or placed on a clinical hold by FDA.  21 U.S.C. § 360bbb-0a(a)(2).  An "eligible patient" is someone who has been diagnosed with a "life-threatening disease or condition," has "exhausted approved treatment options and is unable to participate in a clinical trial involving the eligible investigational drug" (as certified by a physician), and has provided written informed consent regarding the drug in question.  *Id.* § 360bbb-0a(a)(1).

FDA does not review or approve requests for the use of investigational drugs under the Right to Try Act.  Rather, it advises that "the sponsor of the investigational drug . . . is in the best position to provide information about whether the drug . . . meets the criteria to be considered an eligible investigational drug."  FDA, *Right to Try*, https://perma.cc/S9V5-9EW5.  The agency's role primarily involves the receipt and posting of certain information that the manufacturers or sponsors of the drugs must submit.  *See* 21 U.S.C. § 360bbb-0a(d);

13

21 C.F.R. § 300.200(b)-(c) (specifying the deadlines and contents of required submissions).

The Right to Try Act states that it was not intended to "establish a new entitlement" or a "positive right" in any individual.  Pub. L. No. 115-176, § 3(1), 132 Stat. at 1374.  Rather, the law "only expands the scope of individual liberty and agency among patients, in limited circumstances."  *Id.* § 3(3).  It was understood that this new access to investigational drugs would be "consistent with, and . . . act as an alternative pathway alongside, existing expanded access policies."  *Id.* § 3(4).

## B.    Factual and Procedural Background

**1.**  The AIMS Institute "is an integrative oncology clinic located in Seattle."  3-ER-358.  Integrative oncology involves the use of "natural and supportive therapies to reduce side effects, to help optimize conventional care and prevent recurrence" of cancer.  AIMS Inst., *Integrative Oncology*, https://perma.cc/4FWR-95AH.  Dr. Sunil Aggarwal is a co-director of the AIMS Institute and "a palliative care specialist who treats patients with advanced cancer."  3-ER-358.

14

Aggarwal believes that psilocybin could provide benefits to some of his patients who have advanced stage cancer.  3-ER-321.  Psilocybin is a hallucinogenic drug obtained from certain kinds of mushrooms.  DEA, *Psilocybin*, https://perma.cc/6U9D-XBWG.  While it has no currently accepted medical use in treatment, *see* 21 U.S.C. § 812(b), sched. I(c)(15), psilocybin has been studied as an investigational drug for the possible treatment of anxiety and depression, and Aggarwal believes that early trials suggest that the drug shows "enormous promise."  2-ER-14.

When companies registered to distribute psilocybin declined to provide the drug to petitioners without DEA's approval, petitioners sought the agency's guidance as to how they could obtain the drug for therapeutic use under the Right to Try Act.  2-ER-14; 3-ER-358-60. DEA responded that the Right to Try Act "does not waive the requirements of any provision of the [CSA] or its implementing regulations" but noted that Aggarwal could "apply for a schedule I researcher registration with DEA to conduct research with psilocybin" pursuant to § 823(f) of the CSA.  3-ER-363-64.  Petitioners sought judicial review of the agency's response.  This Court dismissed their

15

petition for lack of jurisdiction because DEA's guidance did not constitute a final agency action. *Advanced Integrative Med. Sci. Inst., PLLC v. Garland* (*AIMS*), 24 F.4th 1249 (9th Cir. 2022).

**2.** Following this Court's decision, petitioners sent another letter to DEA. This letter did not seek guidance but rather asked DEA to take two specific actions relevant here. First, petitioners asked DEA to "authorize [Aggarwal] to access psilocybin for therapeutic use with his terminally ill patients" under the Right to Try Act, asserting that no registration under the CSA was required for this activity. 2-ER-19. Second, "[t]o the extent DEA concludes any registration requirement in the CSA or in DEA's implementing regulations applies to this request," petitioners asked in the alternative that the agency waive any such requirement pursuant to 21 U.S.C. § 822(d). 2ER-19.[7]

**3.** DEA provided a final response to petitioners' requests on August 19, 2022. 1-ER-6-8. Noting its previous guidance and this

---

[7] Petitioners also asked DEA to "grant them immunity from prosecution under the CSA with respect to the therapeutic use of psilocybin." 2-ER-19. But they have not offered any argument challenging DEA's response to this request, *see* 1-ER-6 (explaining that immunity under 21 C.F.R. § 1316.24 is only available to practitioners registered to conduct research). That aspect of DEA's decision is therefore not before the Court.

16

Court's subsequent decision, the agency explained that the Right to Try Act does not itself "provide any exemptions from the CSA or its implementing regulations" or "'give the DEA authority to waive'" statutory restrictions.  1-ER-6 (quoting *AIMS*, 24 F.4th at 1261). "Because 'Congress has not yet made an exception to the CSA to allow for the legal use of psilocybin for therapeutic purposes,'" the agency explained, "the CSA's requirements to handle psilocybin for research purposes remain in effect."  1-ER-6 (quoting *AIMS*, 24 F.4th at 1262).

DEA then addressed petitioners' request to waive or make an exception to any statutory or regulatory restrictions that would preclude their access to psilocybin.  DEA noted that under § 822(d) of the CSA, the agency "may, by regulation, waive the requirement for registration of certain manufacturers, distributors, or dispensers if [DEA] finds it consistent with the public health and safety."  21 U.S.C. § 822(d).  DEA declined to initiate a rulemaking, explaining that the agency could not "fully assess [the] proposal" because the petitioners had not provided the agency with "the proposed text, or even the scope, of the regulation" they sought.  1-ER-7.

17

DEA explained that, apart from this threshold failure, a regulation providing access to psilocybin "is not consistent with public health and safety." 1-ER-7. The agency noted determinations by Congress that "the drug has 'a high potential for abuse,' 'no currently accepted medical use in treatment in the United States,' and 'a lack of accepted safety for use . . . under medical supervision.'" 1-ER-7 (quoting 21 U.S.C. § 812(b)(1)). DEA explained that petitioners' "general proposal to abandon altogether these findings and limitations" to permit the therapeutic use of psilocybin "would be too great a departure from current law and inconsistent with public health and safety." 1-ER-7. DEA denied any request under 21 C.F.R. § 1307.03 for an exception to its regulations for similar reasons. 1-ER-7.

DEA also addressed "[t]he historical scenarios involving schedule I controlled substances" that petitioners cited as evidence that "DEA has permitted access to schedule I substances in similar circumstances." 1-ER-7; 2-ER-16. The agency explained that the cited examples "do not support your request" because they were "consistent with th[e] 21 U.S.C. § 823(f) framework." 1-ER-7. Taking the provision of the investigational drug Epidiolex as an example, the agency noted that the

18

"dispensing activity . . . was carried out by practitioners who, unlike Dr. Aggarwal, were registered with DEA to conduct research with schedule I controlled substances—not practitioners who were only authorized to handle schedule II-V controlled substances." 1-ER-7. The agency reiterated the position made clear in previous communications with the petitioners that it "welcomes applications for registration by practitioners" to conduct "research with schedule I controlled substances, including psilocybin," under § 823(f). 1-ER-7.

### SUMMARY OF ARGUMENT

Petitioners asked DEA to take two actions. First, they asked the agency to "authorize [Aggarwal] to access psilocybin for therapeutic use with his terminally ill patients" under the Right to Try Act, asserting that no registration under the CSA was required for this activity. 2-ER-19. Second, "[t]o the extent DEA concludes any registration requirement in the CSA or in DEA's implementing regulations applies to this request," petitioners asked in the alternative that the agency waive any such requirement pursuant to 21 U.S.C. § 822(d). 2-ER-19.

**I.** On the first request, DEA correctly explained that the Right to Try Act does not waive the prohibitions of the CSA or authorize DEA to

19

do so. Under the CSA, a physician can lawfully dispense schedule I substances only as part of government-approved research. There is no registration that would permit such drugs to be dispensed for therapeutic purposes. The Right to Try Act exempts certain conduct from specified requirements under the FDCA, but it does not even mention the CSA or controlled substances.

Petitioners' argument to the contrary rest on a fundamental misunderstanding of the two statutes. The Right to Try Act does not amend the CSA, nor does it repeal the CSA by implication. The CSA and the FDCA (which the Right to Try Act amends) are separate regulatory schemes with separate requirements and restrictions. Nothing in the Right to Try Act changes that. A doctor who wishes to dispense drugs that are also controlled substances must comply with both. *See AIMS*, 24 F.4th 1249, 1254 (9th Cir. 2022).

Petitioners' contention that DEA was required to determine whether Aggarwal is an "essential link" in the CSA's "closed system of distribution" before requiring him to register is similarly without basis in any statute. Neither the CSA nor the Right to Try Act requires any such determination. Indeed, the suggestion that prescribing physicians

20

might not be an essential link in the CSA's system is flatly inconsistent with the statutory scheme created by Congress. Apart from rulemaking permitted by § 822(d), the CSA provides DEA no authority to exempt physicians from the statute's requirements.

**II**. In response to petitioners' second request, DEA declined to initiate a rulemaking for two independent reasons. First, the agency explained that it was unable to fully assess petitioners' proposal because they did not provide the text or even the scope of the waiver they sought. Second, the agency also explained that permitting physicians to dispense psilocybin would not be consistent with public health and safety. As a matter of law, the drug has no accepted medical use in treatment and a lack of accepted safety for use under medical supervision. Particularly in light of petitioners' failure to provide record evidence that would support a contrary finding, DEA reasonably concluded that providing psilocybin to patients for therapeutic purposes would be contrary to public health and safety. Indeed, the agency has never invoked its authority under § 822(d) to permit dispensing a schedule I substance for therapeutic purposes without a registration.

Petitioners failed to demonstrate that DEA was required to engage in the rulemaking they sought. They have forfeited any challenge to DEA's threshold ground for denying their request for a rulemaking. That alone is grounds to deny their petition for review. But they fare no better on the arguments that they did offer. They claim that DEA wrongly relied on congressional determinations regarding the dangers of psilocybin, but it would have been error to not do so on this record. They urge that DEA departed from its past practice, but they point to no examples where DEA has promulgated a rule, or found it consistent with public health and safety, to permit physicians to prescribe schedule I substances for therapeutic use. And they claim that DEA was required to explain why its concerns could not have been addressed through a contract with Aggarwal, but even if doing so could reduce the risks of diversion, it could not alleviate the risks to patients themselves.

## STANDARD OF REVIEW

"The narrow parameters of [this Court's] review are set by the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* (APA), and this [C]ourt may not substitute its judgment for the agency's." *Fry v. DEA*,

22

353 F.3d 1041, 1043 (9th Cir. 2003). DEA's decision "may be set aside only if arbitrary, capricious, an abuse of discretion or not in accordance with the law." *Id.* (citing 5 U.S.C. § 706(2)(A)). With respect to an agency's refusal to initiate a rulemaking, "the Court's review is extremely limited and highly deferential." *Compassion Over Killing v. U.S. FDA*, 849 F.3d 849, 854 (9th Cir. 2017) (quotation marks omitted).

## ARGUMENT

### I. DEA Correctly Explained that the Right to Try Act Does Not Waive the Prohibitions of the CSA or Authorize DEA to Do So.

#### A. The Right to Try Act Does Not Affect CSA Registration Requirements.

To dispense controlled substances lawfully, a physician must be registered with DEA. 21 U.S.C. § 822(a)(2). Once registered, a physician may only prescribe controlled substances "to the extent authorized by their registration and in conformity with the other provisions of [the CSA]," *id*. § 822(b). "Because substances in Schedule I are deemed to have no accepted medical use under the CSA," *AIMS*, 24 F.4th 1249, 1254 (9th Cir. 2022), the law does not provide for any registration that would permit such drugs to be dispensed in the course of professional practice. *See United States v. Oakland Cannabis Buyers'*

23

*Coop*, 532 U.S. 483, 492 n.5 (2001) ("Unlike drugs in other schedules, schedule I drugs cannot be dispensed under a prescription." (citation omitted)).  Rather, the only registration that would permit a physician to dispense a schedule I controlled substance is registration as a researcher conducting an approved research project under § 823(f).  *Id.*; *AIMS*, 24 F.4th at 1254.  DEA cannot issue such a registration unless the Secretary of Health and Human Services, acting through FDA, determines that the research protocol is meritorious and the applicant is qualified and competent to conduct it.  21 U.S.C. § 823(f) (2021); 21 C.F.R. § 1301.32.

The Right to Try Act amended the FDCA to provide a new pathway by which patients with qualifying conditions can gain access to certain medical products that have not been approved by FDA.  The statute provides that "[e]ligible investigational drugs provided to eligible patients in compliance with this section are exempt from" specified statutory and regulatory provisions of the FDCA that govern the labeling, approval, and clinical trials of drugs.  21 U.S.C. § 360bbb-0a(b); *see AIMS*, 24 F.4th at 1253 ("The [Right to Try] Act's primary function is to relieve qualifying individuals from regulatory

24

requirements that would otherwise be imposed on eligible investigational drugs under the [FDCA]."); 2-ER-15 (petitioners' letter to DEA stating that the Right to Try Act "exempts investigational drugs from the FDA's premarketing approval requirements"). An "eligible investigational drug" is a drug that has not been approved by FDA but meets certain criteria related to the review process and has not been discontinued by the manufacturer or placed on a clinical hold by FDA. 21 U.S.C. § 360bbb-0a(a)(2).

The Right to Try Act does not provide anyone with a right to dispense or to receive controlled substances. *See AIMS*, 24 F.4th at 1253 ("The Act specifies that it was not intended to 'establish a new entitlement' or a 'positive right' in any individual.'" (quoting § 3(1)). As DEA explained, the Right to Try Act does not "provide any exemptions from the CSA or its implementing regulations." 1-ER-6; *see* 21 U.S.C. § 360bbb-0a(b). And it does not "give the DEA authority to waive CSA requirements." ER6 (quoting *AIMS*, 24 F.4th at 1261). Indeed, the Right to Try Act does not even mention the CSA or controlled substances at all. Thus, as this Court recognized, "Congress has not yet made an exception to the CSA to allow for the legal use of psilocybin for

25

therapeutic purposes." *AIMS*, 24 F.4th at 1262.  And absent such an exception, the CSA's prohibition on the use of psilocybin except for research purposes under § 823(f) "remain[s] in effect."  1-ER-6.

### B.    Petitioners Identify No Error in DEA's Legal Analysis.

**1.**  In arguing to the contrary, petitioners construct a tortuous account of the interaction of the two statutes that would vest authority in DEA to allow physicians to provide patients with schedule I substances for therapeutic purposes, notwithstanding Congress's determination that the drugs lack accepted medical use or safety under medical supervision.  Petitioners first note that the CSA's longstanding savings provision provides that "[n]othing in this [Act]," with some exceptions not relevant here, "shall be construed as in any way affecting, modifying, repealing, or superseding the provisions of the Federal Food, Drug, and Cosmetic Act."  21 U.S.C. § 902.  They then observe (Br. 33-35) that the Right to Try Act amended the FDCA by permitting a doctor to dispense eligible investigational drugs for therapeutic use "without having to seek FDA's permission first."  From this, they reason that if DEA were to limit access to psilocybin under § 823(f) to only those research projects that FDA allows to proceed, the

26

result would be to "re-impose the FDA-approval requirement that Congress expressly removed," in the Right to Try Act. Br. 34 (brackets omitted). And this, they conclude, would "violate" § 902. *Id.*

This argument underscores petitioners' fundamental misunderstanding of the relationship of the two statutes. The Right to Try Act exempts eligible investigational drugs only from "specified statutory and regulatory provisions" contained in or derived from the FDCA. *AIMS*, 24 F.4th at 1253; *see* 21 U.S.C. § 360bbb-0a(b). It does not amend the restrictions that the CSA places on schedule I substances or amend DEA's authority to administer that statute. *See AIMS*, 24 F.4th at 1261 (explaining that the Right to Try Act's exemption provision "did not give the DEA authority to waive CSA requirements"). It does not mention the CSA at all.

Nor is there any basis whatsoever for a contention that the Right to Try Act worked an implied repeal of § 823(f), an argument that would run headlong into the "cardinal rule" of statutory interpretation that "repeals by implication are not favored." *Morton v. Mancari*, 417 U.S. 535, 549 (1974) (quoting *Posadas v. National City Bank of N.Y.*, 296 U.S. 497, 503 (1936)). Courts presume that "Congress will specifically

27

address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quotation marks omitted). Congress did so in the Right to Try Act, which carefully identifies the specific legal provisions of the FDCA and its implementing regulations that are displaced but says nothing about the CSA.

Petitioners' posited tensions between the CSA and the FDCA are without basis. While the subject matter of the two statutes overlaps somewhat (because they both deal with drugs), each statute establishes its own requirements and prohibitions, and DEA and FDA have complementary spheres of authority. For example, applications under § 823(f) to conduct research using drugs that are classified as controlled substances and have not received approval for marketing under the FDCA must be approved by DEA and allowed to proceed by FDA. *See* 21 U.S.C. § 823(f) (2021); *id.* § 355(i); 21 C.F.R. pt. 312. Either agency can act to prevent the research from going forward. But that does not mean that one agency has superseded or interfered with the other's statutory regime. Nothing in the Right to Try Act changes that. *See AIMS*, 24 F.4th at 1254 ("Any person or organization that produces or

28

distributes prescription drugs that are also controlled substances must comply with the requirements of both the FDCA and the CSA.").

Indeed, petitioners' argument fails to account for recent amendments to the researcher registration provision of the CSA. In late 2022, Congress created "a new, separate registration process to facilitate research on marijuana." Cong. Research Serv., Bill Summary, H.R. 8454, 117th Cong. (2022), https://www.congress.gov/bill/117th-congress/house-bill/8454. As with research into other schedule I substances, this new process still requires that new research projects be "reviewed and allowed . . . by the Secretary of Health and Human Services under section 355(i)." 21 U.S.C. § 823(g)(2)(B)(i)(I). Thus, even when Congress has acted specifically to enhance research of a Schedule I drug, it has made researcher registration conditional on approval by the Secretary.

Even on its own terms, petitioners' argument would not help them achieve their objective of "obtain[ing] psilocybin for therapeutic use for [Aggarwal's] terminally ill patients." 2-ER-15. Section § 823(f) permits registration to dispense schedule I substances solely "for the purpose of *bona fide research.*" 21 U.S.C. § 823(f) (2021) (emphasis added). If

29

petitioners were correct that, following adoption of the Right to Try Act, DEA is not required to refer research registration applications to the Secretary, the agency still could not grant petitioners authority to dispense psilocybin outside of a "research protocol." *Id.*; *see id.* § 822(b) (providing that registrants may only dispense controlled substances "to the extent authorized by their registration").[8]

Finally, petitioners are mistaken when they assert that DEA disregarded their contentions regarding the impact of the Right to Try Act in denying their petition. The agency explained that petitioners' letter "reflects a fundamental misunderstanding of the relationship between the [Right to Try Act] and the CSA." 1-ER-6. It explained that the Right to Try Act has a limited scope (displacing only "certain FDCA requirements governing the labeling, approval, and clinical trials of

---

[8] Contrary to petitioners' suggestion (Br. 33-34), DEA never "attempt[ed] to require Dr. Aggarwal to register under § 823(f)" in order to dispense psilocybin for therapeutic use. Rather, the agency explained that "practitioners who seek to dispense or possess schedule I controlled substances must be properly registered as an approved researcher in accordance with the CSA and its implementing regulations." 1-ER-6. While the agency identified such a registration as "[a] potential avenue for Dr. Aggarwal to pursue," 3-ER-364, it made clear that this route is available only to "practitioners seeking to conduct bona fide research." 1-ER-7.

drugs") and does not provide "any exemptions from the CSA." ER-6. DEA understood and squarely rejected petitioners' assertion that "Congress expressly removed" the requirements of § 823(f) "through the enactment of [the Right to Try Act]." 2-ER-19.[9]

**2.** Petitioners' contention (Br. 24-30) that DEA was required to determine whether Aggarwal is an "essential link in the closed system of distribution" created by the CSA is similarly without basis in any statute. The CSA requires "[e]very person who dispenses, or who proposes to dispense, any controlled substance" to "obtain from the Attorney General a registration," 21 U.S.C. § 822(a)(2); it allows registered physicians to dispense controlled substances only "to the

---

[9] Several states, as *amici curiae*, offer various federalism-based arguments for an unduly narrow reading of the CSA. Because petitioners have not advanced these arguments, this Court should not consider them. *See Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 719 n.10 (9th Cir.2003) ("In the absence of exceptional circumstances, which are not present here, we do not address issues raised only in an amicus brief."). In any event, these arguments lack merit. Even where state laws expressly authorize medicinal use of controlled substances—creating the strongest possible federalism concerns—the CSA supersedes them. *See, e.g., Gonzales v. Raich*, 545 U.S. 1, 5 (2005) (holding that Congress could properly "prohibit the local cultivation and use of marijuana in compliance with California law"); *United States v. Canori*, 737 F.3d 181, 184 (2d Cir. 2013) ("Marijuana remains illegal under federal law, even in those states in which medical marijuana has been legalized.").

31

extent authorized by their registration and in conformity with the other provisions of [the CSA]," *id*. § 822(b); and it limits physician registrations dispense schedule I substances to "bona fide research," *id*. § 823(f) (2021). The Right to Try to Act does not waive any of these provisions or authorize DEA to waive them. *Id*. § 360bbb-0a(b); *AIMS*, 24 F.4th at 1261. Neither statute makes an exception for (or even uses the phrase) "essential link in the closed system of distribution."

Further, petitioners' suggestion that prescribing physicians might not be an essential link in the closed system of distribution is flatly inconsistent with the statutory scheme created by Congress. "Congress was particularly concerned with the diversion of drugs from legitimate channels to illegitimate channels," and "[i]t was aware that registrants, who have the greatest access to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic." *United States v. Moore*, 423 U.S. 122, 135 (1975).

The CSA's requirements that physicians who dispense controlled substances must register with the Attorney General and may not dispense substances outside the scope of their registrations reflect a

32

congressional determination that physicians are essential links in the closed system of distribution. Indeed, the only way that a controlled substance can be lawfully dispensed to a patient is pursuant to a physician's prescription. *Gonzales v. Oregon*, 546 U.S. 243, 254 (2006); *see also* 70 Fed. Reg. 11695, 11696 (Mar. 9, 2005) ("The [CSA] establishes a 'closed system' of distribution that regulates the movement of controlled substance prescription medications from importation or manufacture through their delivery to the ultimate user patient via the dispensing, administering or prescribing, pursuant to the lawful order of a practitioner."); 68 Fed. Reg. 58587, 58590 (Oct. 10, 2003) ("Congress, through the [CSA], established a closed system of controlled substance distribution encompassing manufacturers, distributors, pharmacies and practitioners; that is, within this closed system a controlled substance can be traced from the time it is manufactured to the time it is dispensed to the ultimate user.").

To the extent that petitioners suggest (Br. 29) that DEA has an "inherent," non-textual authority to make individual exceptions to the registration requirement (and that this authority in turn requires an individualized determination of Aggarwal's importance to the closed

33

system of distribution), they are mistaken. The CSA provides that DEA can "waive the requirement for registration" for "certain . . . dispensers" but may only do so "by regulation" and where doing so is "consistent with the public health and safety." 21 U.S.C. § 822(d).[10] As discussed below, *see infra* Part II, DEA acknowledged that authority and declined to exercise it. *See* 1-ER-7 (providing two independent bases to deny the request to initiate a rulemaking). The CSA provides no other authority to exempt an individual practitioner from that statute's registration requirement. Other statutes might require DEA to make exceptions to CSA requirements in certain limited circumstances. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006) (explaining that the Religious Freedom and Restoration Act "operates by mandating consideration, under the compelling interest test, of

---

[10] This is the authority discussed in the government's brief in *Iowaska Church of Healing v. Werfel*, No. 23-5122 (D.C. Cir.) (Dec. 8, 2023), cited at Br. 30. *See Iowaska* Br. 27 ("In enacting the CSA, Congress specifically authorized the Attorney General to register an applicant . . . , or to waive the registration requirement altogether 'if he finds it consistent with the public health and safety." (citing 21 U.S.C. § 822(a), (d))). The government pointed to this authority to argue that "Congress has not authorized the IRS to make exceptions to the CSA," as the plaintiffs in that case had suggested. *Id.*

34

exceptions to 'rules of general applicability'" (alteration omitted)).  But petitioners have identified no such statute that would apply to them.

## II.    DEA Reasonably Declined to Initiate a Rulemaking to Waive the CSA's Registration Requirement to Permit Dispensing Psilocybin for Therapeutic Purposes.

As explained above, the CSA requires physicians who dispense controlled substances to register with DEA, and it prohibits physicians from dispensing controlled substances beyond the authorization permitted by their registration.  21 U.S.C. § 822.  The only registrations permitted with respect to schedule I substances like psilocybin are for "bona fide research."  *Id.* § 823(f) (2021).  The agency correctly explained that the Right to Try Act did not alter those requirements.

In the alternative, petitioners asked that the agency waive the CSA's registration requirement so that Aggarwal may be permitted to dispense psilocybin to patients for therapeutic use.  2-ER-18-19.  The CSA permits DEA (as the Attorney General's delegatee), to "waive the requirement for registration of certain . . . dispensers," "by regulation," where doing so would be "consistent with the public health and safety." 21 U.S.C. § 822(d).

35

DEA declined petitioners' request for a such a rulemaking.  This Court's review of DEA's decision not to promulgate regulations "is 'extremely limited' and 'highly deferential.'"  *Compassion Over Killing v. U.S. FDA*, 849 F.3d 849, 854 (9th Cir. 2017) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 527-28 (2007)); *see also id.* (citing case law for the proposition that an "'agency's refusal to institute rulemaking proceedings is at the high end of the range' of levels of deference we give to agency action under our 'arbitrary and capricious' review").

### A.  DEA Concluded that the Petition Was Inadequate and that the Requested Waiver Would be Inconsistent with Public Health and Safety.

The agency offered two independent bases for denying petitioners' request for a waiver under § 822(d).[11]

First, the agency stated that it was "unable to fully assess [their] proposal" because petitioners did not provide "the proposed text, or even the scope," of the waiver they sought.  1-ER-07.  It is unclear from petitioners' letter whether they sought an individual waiver for

---

[11] DEA explained that it would deny any request, to the extent petitioners made one, for an exception to its regulations under 21 C.F.R. § 1307.03 for similar reasons.  1-ER-7.

36

Aggarwal personally or a class-based waiver for physicians who wish to prescribe psilocybin (or any other schedule I controlled substance that has been the subject of some initial clinical trials) for therapeutic use. *Compare* 2-ER-18 (stating that "as far as Dr. Aggarwal is aware, he is in a category all his own") *with* 2-ER-19 (urging that registration was inappropriate for "physicians like Dr. Aggarwal who seek to administer schedule I substances to ultimate users for therapeutic purposes"). Similarly, petitioners acknowledge that "security and diversion controls" would be "appropriate," 2-ER-19, but they do not identify which controls they request (or which controls they would view as too onerous). Given these significant omissions, it was reasonable for DEA to conclude that it could not fully assess petitioners' request for a waiver and to decline to initiate a rulemaking on that basis. *Cf.* 21 C.F.R. § 1308.43(b) (providing that requests for rulemaking under another provision of the CSA must include, among other things, "[t]he proposed rule in the form proposed by the petitioner").

Second, the agency also explained that, even apart from this threshold defect, "accommodat[ing] [petitioners'] requested access to psilocybin" would not be "consistent with public health and safety." 1-

37

ER-17; *see* 21 U.S.C. § 822(d). The agency relied on Congress's

determinations that "the drug has 'a high potential for abuse,'" "'no

currently accepted medical use in treatment in the United States,'" and

"'a lack of accepted safety for use . . . under medical supervision.'" 1-

ER-017 (alteration in original) (quoting 21 U.S.C. § 812(b)(1)). DEA

further noted that Congress had created "explicit" limitations on

"practitioners seeking to dispense schedule I controlled substances,"

permitting them to do so only in the context of research. 1-ER-017. The

agency concluded that petitioners' "general proposal to abandon

altogether these findings and limitations" and permit use of psilocybin

for therapeutic use "would be too great a departure from current law

and inconsistent with public health and safety." 1-ER-017.

DEA "clearly indicate[d] that it has considered the potential

problem identified in the petition and provide[d] a 'reasonable

explanation as to why it cannot or will not exercise its discretion' to

initiate rulemaking." *Compassion Over Killing*, 849 F.3d at 857

(quoting *Massachusetts*, 549 U.S. at 533). The agency explained that

Congress had made findings directly relevant to petitioners' request and

that granting them a waiver would run directly contrary to the reasons

supporting the legislative classification of psilocybin. Unless and until

psilocybin is rescheduled, the law in this country is that the drug has no

"accepted medical use in treatment," and it is not considered safe to use

even "under medical supervision." 21 U.S.C. § 812(b)(1); *see also O*

*Centro* 546 U.S. at 432 (noting that "Schedule I substances . . . are

exceptionally dangerous"). Particularly in light of petitioners' failure to

provide any record evidence that would support a contrary finding and

their failure to present a proposal addressing those risks, it was entirely

reasonable for DEA to conclude that waiving a statutory prohibition on

using the drug for therapeutic purposes outside the strictly controlled

confines of medical research would be contrary to "public health and

safety."

DEA's conclusion in this matter is also consistent with its prior

practice. The agency has adopted several rules exempting classes of

individuals from the CSA's registration requirement. For example, law

enforcement officers may possess controlled substances in the course of

their official duties, individual practitioners operating under the

registration of a hospital may prescribe controlled substances, and

members of the Native American Church may possess peyote for

39

religious purposes, all without obtaining individual registrations.
21 C.F.R. §§ 1301.22(c), 1301.24(a)(2), 1307.31.  But no DEA rule
permits dispensing a schedule I substance for therapeutic use, under
any circumstances, without a registration.  To do so, as the agency
explained here, would be a radical "departure from current law and
inconsistent with public health and safety."  1-ER-017.

### B.    Petitioners Fail to Carry Their Heavy Burden to Require DEA to Engage in Rulemaking.

**1.**  As an initial matter, petitioners challenge only one of the two
independent grounds invoked by DEA to deny their petition.  They do
not contest DEA's conclusion that it was unable to fully assess their
proposal because they had failed to provide the proposed text or scope of
the rule they seek pursuant to § 822(d).  Nor do they deny that DEA
could properly deny a request for a waiver on this ground.  Thus,
petitioners have forfeited any challenge to DEA's decision on this
ground.  *See Rodriguez-Hernandez v. Garland*, 89 F.4th 742, 745 n.1
(9th Cir. 2023) ("[The petitioner] forfeited any challenge to that ruling
due to his failure to raise it in his Opening Brief."); *Greenwood v. FAA*,
28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are
argued specifically and distinctly in a party's opening brief.").  And

40

when a decision is based on two independent grounds, one of which is unchallenged, a petition for review cannot succeed, regardless of the merits of any arguments pertaining to the alternate ground. *See, e.g.*, *Weston v. Lockheed Missiles & Space Co.*, 881 F.2d 814, 815-16 (9th Cir. 1989); *see also Lin v. Garland*, No. 19-71623, 2023 WL 3055283 (9th Cir. Apr. 24, 2023); *Carcamo-Recinos v. Ashcroft*, 389 F.3d 253, 257 (1st Cir. 2004); *Murrell v. Shalala*, 43 F.3d 1388, 1389-90 (10th Cir. 1994).

The failure to provide even a minimally adequately detailed proposal is a distinct ground for denying the petition and would have warranted denial even if DEA had not addressed the reasons why it would be improper to permit a physician to dispense a schedule I substance for therapeutic use without a registration. An agency, no less than a district court, may find a party's request for relief defective on both threshold and substantive grounds. This does not prevent a reviewing court from affirming agency action based solely on the threshold defect. *See, e.g.*, *Mendez-Alcaraz v. Gonzales*, 464 F.3d 842,

41

844 (9th Cir. 2006) (declining to reach other grounds where one independent basis was sufficient).[12]

**2.**   Petitioners fare no better on the ground that they actually did preserve.  They seek to compel DEA to issue a regulation waiving the CSA's registration requirement with respect to physicians who dispense psilocybin for therapeutic purposes.  That relief would be available only if petitioners demonstrated that the CSA or the record before the agency so plainly compelled a waiver that the agency had no choice but to issue the regulation that petitioners sought (but failed to actually propose).  Petitioners have not carried this burden.

First, they argue (Br. 37-39) that the agency's reliance on "the characteristics of schedule I substances and the restrictions Congress placed on [the] use of those substances" is improper under the Supreme Court's decision in *O Centro*, 546 U.S. 418.  In that case, the Supreme Court held that the government could not satisfy the "more focused inquiry" required by the Religious Freedom Restoration Act by pointing to "the general characteristics of Schedule I substances."  *Id.* at 432.

---

[12] The same analysis applies to DEA's decision to deny an exception to any regulatory requirement pursuant to 21 C.F.R. § 1307.03, which petitioners fail to address.

42

But petitioners do not have a claim under the Religious Freedom Restoration Act, and § 822(d) of the CSA does not require an analysis focused on "the person" requesting a waiver.  *Id.* at 430 (quoting 42 U.S.C. § 2000bb-1(b)).  Rather, it permits waiver of the registration requirement for classes of "manufacturers, distributors, or dispensers" by generally applicable "regulation."  21 U.S.C. § 822(d).

Further, the Supreme Court in *O Centro* found that reliance on congressional findings was insufficient in that context because there was "no indication that Congress . . . considered the harms posed by the particular use at issue" in that case, namely "the circumscribed, sacramental use" of a substance by a religious entity.  546 U.S. at 432.  Here, however, Congress considered the same use that petitioners seek when it determined that psilocybin had "no currently accepted medical use in treatment in the United States" and "a lack of accepted safety for use . . . under medical supervision."  21 U.S.C. § 812(b)(1).  It was therefore entirely proper for DEA to consider this congressional determination.  Indeed, it would have been error to not do so.

Second, petitioners contend (Br. 37, 39-42) that DEA's denial of their petition "marked an unexplained departure from the agency's past

43

practice and precedent."  But none of the examples they cite involve DEA promulgating a rule, or otherwise making a determination that it would be consistent with public health and safety, to exempt practitioners from the CSA's registration requirement so that they can prescribe schedule I substances for therapeutic use.  Further, as DEA explained, the history petitioners cite is "consistent with" the framework of § 823(f), which permits physicians to engage in such conduct only in the context of medical research.  1-ER-7.  In one example involving the provision of an investigational anti-seizure drug to minors, the dispensing was "carried out by practitioners who, unlike Dr. Aggarwal, were registered with DEA to conduct research with schedule I controlled substances."  1-ER-7.  In another, access to marijuana was provided under "single patient INDs [i.e., applications for investigational new drugs]" and was *terminated* precisely because of its "anomalous status" and "concerns about the government's legal authority to distribute marijuana for this purpose."  *Kuromiya v. United States*, 78 F. Supp. 2d 367, 369 (E.D. Pa. 1999) (brackets omitted).  And the third did not involve the dispensing of controlled substances to patients at all, but rather the collection of controlled substances for

44

return to the manufacturer or disposal.  2-ER-18 (describing "reverse distributors").

Petitioners are mistaken to suggest (Br. 21, 41) that DEA was required to discuss each of the historical scenarios offered in their petition.  Even in notice-and-comment rulemaking, an agency would not be required to do so.  *See Environmental Def. Fund v. EPA*, 922 F.3d 446, 458 (D.C. Cir. 2019) ("Nothing in the APA saddles agencies with the crushing task of responding to every single example cited in every single comment . . . .").  But this was not notice-and-comment rulemaking; it was a denial of a petition to initiate a rulemaking.  The APA required only that the agency provide "a brief statement of the grounds for denial" of the petition, 5 U.S.C. § 555(e), and it did so.

Third, and finally, petitioners contend (Br. 42-46) that DEA improperly failed to explain why its health and safety concerns could not be mitigated by having Aggarwal enter into a memorandum of understanding that could "address any security or diversion concerns DEA might have."  But the answer is clear from DEA's response letter.  The agency explained that providing petitioners with access to psilocybin for therapeutic use was not consistent with public health and

45

safety because the drug has "a high potential for abuse," "no currently accepted medical use in treatment" and "a lack of accepted safety for use . . . under medical supervision." 1-ER-7 (alteration in original) (quoting 21 U.S.C. § 812(b)(1)). Even if contractual arrangements could help to mitigate the potential for abuse through diversion (which petitioners have not established) they could not possibly alleviate the other two harms, because Aggarwal would still be dispensing an unproven and dangerous substance to patients for treatment.

Petitioners wrongly suggest (Br. 43) that DEA has relied on memoranda of understanding in lieu of registration "in similar situations." They point to the agency's treatment of "reverse distributors"—entities that acquire controlled substances for the purpose of returning them to the manufacturer or destroying them, *see* 21 C.F.R. § 1300.01—before they were expressly covered by regulations. But as the rulemaking petitioners rely on explains, in that situation memoranda were used as vehicles to "gran[t] DEA registrations," not to waive registration. 3-ER-366. This example therefore provides no support for the suggestion that DEA could use a memorandum of

46

understanding to a circumvent statutory requirement, much less one applicable to practitioners who dispense dangerous drugs to patients.

Petitioners' reliance on *Motor Vehicle Manufacturers Association of the U.S. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), is misplaced. In that case, as petitioners recognize, the agency rescinded its own safety standard without "address[ing] its prior factual findings" that had supported the standard. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 967 (9th Cir. 2015) (en banc); *see also McFarland v. Kempthorne*, 545 F.3d 1106, 1113 (9th Cir. 2008) (explaining that "the critical factor in [State Farm] was that the agency 'submitted no reasons at all' for its decision"). Here, DEA did not change its position, and it did not fail to provide reasons for its decision to not institute a rulemaking. Rather, the agency identified the correct statutory standard and explained why it was not met. The APA required nothing more.

47

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney*
*General*

MARK B. STERN

*s/ Thomas Pulham*
THOMAS PULHAM
*Attorneys, Appellate Staff*
*Civil Division, Room 7323*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4332*
*thomas.pulham@usdoj.gov*

April 2024

48

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, respondents state that

they know of no related case pending in this Court.

*s/ Thomas Pulham*

Thomas Pulham

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,260 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Thomas Pulham*
Thomas Pulham

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2024, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court

of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

*s/ Thomas Pulham*
Thomas Pulham

**ADDENDUM**

## TABLE OF CONTENTS

21 U.S.C. § 360bbb-0a ............................................................... A1

21 U.S.C. § 812 (excerpts) ........................................................ A4

21 U.S.C. § 822 (excerpts) ........................................................ A7

21 U.S.C. § 823(f) (2021) ........................................................ A10

21 U.S.C. § 823(g) ................................................................... A12

Pub. L. No. 115-176 (excerpts) ............................................. A18

**21 U.S.C. § 360bbb-0a**

**§ 360bbb-0a.  Investigational drugs for use by eligible patients.**

(a) Definitions

For purposes of this section—

    (1) the term "eligible patient" means a patient—

        (A) who has been diagnosed with a life-threatening disease or condition (as defined in section 312.81 of title 21, Code of Federal Regulations (or any successor regulations));

        (B) who has exhausted approved treatment options and is unable to participate in a clinical trial involving the eligible investigational drug, as certified by a physician, who—

            (i) is in good standing with the physician's licensing organization or board; and

            (ii) will not be compensated directly by the manufacturer for so certifying; and

        (C) who has provided to the treating physician written informed consent regarding the eligible investigational drug, or, as applicable, on whose behalf a legally authorized representative of the patient has provided such consent;

    (2) the term "eligible investigational drug" means an investigational drug (as such term is used in section 360bbb of this title)—

        (A) for which a Phase 1 clinical trial has been completed;

        (B) that has not been approved or licensed for any use under section 355 of this title or section 351 of the Public Health Service Act;

        (C)(i) for which an application has been filed under section 355(b) of this title or section 351(a) of the Public Health Service Act; or

        (ii) that is under investigation in a clinical trial that—

            (I) is intended to form the primary basis of a claim of effectiveness in support of approval or licensure under section 355 of this title or section 351 of the Public Health Service Act; and

A1

(II) is the subject of an active investigational new drug application under section 355(i) of this title or section 351(a)(3) of the Public Health Service Act, as applicable; and

(D) the active development or production of which is ongoing and has not been discontinued by the manufacturer or placed on clinical hold under section 355(i) of this title; and

(3) the term "phase 1 trial" means a phase 1 clinical investigation of a drug as described in section 312.21 of title 21, Code of Federal Regulations (or any successor regulations).

(b) Exemptions

Eligible investigational drugs provided to eligible patients in compliance with this section are exempt from sections 352(f), 353(b)(4), 355(a), and 355(i) of this title, section 351(a) of the Public Health Service Act, and parts 50, 56, and 312 of title 21, Code of Federal Regulations (or any successor regulations), provided that the sponsor of such eligible investigational drug or any person who manufactures, distributes, prescribes, dispenses, introduces or delivers for introduction into interstate commerce, or provides to an eligible patient an eligible investigational drug pursuant to this section is in compliance with the applicable requirements set forth in sections 312.6, 312.7, and 312.8(d)(1) of title 21, Code of Federal Regulations (or any successor regulations) that apply to investigational drugs.

(c) Use of clinical outcomes

(1) In general

Notwithstanding any other provision of this chapter, the Public Health Service Act, or any other provision of Federal law, the Secretary may not use a clinical outcome associated with the use of an eligible investigational drug pursuant to this section to delay or adversely affect the review or approval of such drug under section 355 of this title or section 351 of the Public Health Service Act unless—

(A) the Secretary makes a determination, in accordance with paragraph (2), that use of such clinical outcome is critical to determining the safety of the eligible investigational drug; or

A2

(B) the sponsor requests use of such outcomes.

(2) Limitation

If the Secretary makes a determination under paragraph (1)(A), the Secretary shall provide written notice of such determination to the sponsor, including a public health justification for such determination, and such notice shall be made part of the administrative record. Such determination shall not be delegated below the director of the agency center that is charged with the premarket review of the eligible investigational drug.

(d) Reporting

(1) In general

The manufacturer or sponsor of an eligible investigational drug shall submit to the Secretary an annual summary of any use of such drug under this section. The summary shall include the number of doses supplied, the number of patients treated, the uses for which the drug was made available, and any known serious adverse events. The Secretary shall specify by regulation the deadline of submission of such annual summary and may amend section 312.33 of title 21, Code of Federal Regulations (or any successor regulations) to require the submission of such annual summary in conjunction with the annual report for an applicable investigational new drug application for such drug.

(2) Posting of information

The Secretary shall post an annual summary report of the use of this section on the internet website of the Food and Drug Administration, including the number of drugs for which clinical outcomes associated with the use of an eligible investigational drug pursuant to this section was—

(A) used in accordance with subsection (c)(1)(A);

(B) used in accordance with subsection (c)(1)(B); and

(C) not used in the review of an application under section 355 of this title or section 351 of the Public Health Service Act.

A3

**21 U.S.C. § 812 (excerpts)**

**§ 812.  Schedules of controlled substances.**

(a) Establishment

There are established five schedules of controlled substances, to be known as schedules I, II, III, IV, and V. Such schedules shall initially consist of the substances listed in this section. The schedules established by this section shall be updated and republished on a semiannual basis during the two-year period beginning one year after October 27, 1970, and shall be updated and republished on an annual basis thereafter.

(b) Placement on schedules; findings required

Except where control is required by United States obligations under an international treaty, convention, or protocol, in effect on October 27, 1970, and except in the case of an immediate precursor, a drug or other substance may not be placed in any schedule unless the findings required for such schedule are made with respect to such drug or other substance. The findings required for each of the schedules are as follows:

(1) Schedule I—

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has no currently accepted medical use in treatment in the United States.

(C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

(2) Schedule II—

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.

(C) Abuse of the drug or other substances may lead to severe psychological or physical dependence.

(3) Schedule III—

A4

(A) The drug or other substance has a potential for abuse less than the drugs or other substances in schedules I and II.

(B) The drug or other substance has a currently accepted medical use in treatment in the United States.

(C) Abuse of the drug or other substance may lead to moderate or low physical dependence or high psychological dependence.

(4) Schedule IV—

(A) The drug or other substance has a low potential for abuse relative to the drugs or other substances in schedule III.

(B) The drug or other substance has a currently accepted medical use in treatment in the United States.

(C) Abuse of the drug or other substance may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in schedule III.

(5) Schedule V—

(A) The drug or other substance has a low potential for abuse relative to the drugs or other substances in schedule IV.

(B) The drug or other substance has a currently accepted medical use in treatment in the United States.

(C) Abuse of the drug or other substance may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in schedule IV.

(c) Initial schedules of controlled substances

Schedules I, II, III, IV, and V shall, unless and until amended1 pursuant to section 811 of this title, consist of the following drugs or other substances, by whatever official name, common or usual name, chemical name, or brand name designated:

## Schedule I

...

(c) Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains

A5

any of their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

...

(15) Psilocybin.

...

...

**21 U.S.C. § 822 (excerpts)**

**§ 812.  Persons required to register.**

(a) Period of registration

(1) Every person who manufactures or distributes any controlled substance or list I chemical, or who proposes to engage in the manufacture or distribution of any controlled substance or list I chemical, shall obtain annually a registration issued by the Attorney General in accordance with the rules and regulations promulgated by him.

(2) Every person who dispenses, or who proposes to dispense, any controlled substance, shall obtain from the Attorney General a registration issued in accordance with the rules and regulations promulgated by him. The Attorney General shall, by regulation, determine the period of such registrations. In no event, however, shall such registrations be issued for less than one year nor for more than three years.

(3)(A) Except as provided in subparagraph (C), the registration of any registrant under this subchapter to manufacture, distribute, or dispense controlled substances or list I chemicals terminates if and when such registrant—

    (i) dies;

    (ii) ceases legal existence;

    (iii) discontinues business or professional practice; or

    (iv) surrenders such registration.

(B) In the case of such a registrant who ceases legal existence or discontinues business or professional practice, such registrant shall promptly notify the Attorney General in writing of such fact.

(C) No registration under this subchapter to manufacture, distribute, or dispense controlled substances or list I chemicals, and no authority conferred thereby, may be assigned or otherwise transferred except upon such conditions as the Attorney General may specify and then only pursuant to written consent. A registrant to whom a registration is assigned or transferred pursuant to the preceding sentence may not

A7

manufacture, distribute, or dispense controlled substances or list I chemicals pursuant to such registration until the Attorney General receives such written consent.

(D) In the case of a registrant under this subchapter to manufacture, distribute, or dispense controlled substances or list I chemicals desiring to discontinue business or professional practice altogether or with respect to controlled substances and list I chemicals (without assigning or transferring such business or professional practice to another entity), such registrant shall return to the Attorney General for cancellation—

(i) the registrant's certificate of registration;

(ii) any unexecuted order forms in the registrant's possession; and

(iii) any other documentation that the Attorney General may require.

(b) Authorized activities

Persons registered by the Attorney General under this subchapter to manufacture, distribute, or dispense controlled substances or list I chemicals are authorized to possess, manufacture, distribute, or dispense such substances or chemicals (including any such activity in the conduct of research) to the extent authorized by their registration and in conformity with the other provisions of this subchapter.

(c) Exceptions

The following persons shall not be required to register and may lawfully possess any controlled substance or list I chemical under this subchapter:

(1) An agent or employee of any registered manufacturer, distributor, or dispenser of any controlled substance or list I chemical if such agent or employee is acting in the usual course of his business or employment.

(2) A common or contract carrier or warehouseman, or an employee thereof, whose possession of the controlled substance or list I chemical is in the usual course of his business or employment.

(3) An ultimate user who possesses such substance for a purpose specified in section 802(25)1 of this title.

A8

(d) Waiver

The Attorney General may, by regulation, waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety.

...

**21 U.S.C. § 823(f) (2021)**

**§ 823.  Registration requirements.**

…

(f) Research by practitioners; pharmacies; research applications; construction of Article 7 of the Convention on Psychotropic Substances

The Attorney General shall register practitioners (including pharmacies, as distinguished from pharmacists) to dispense, or conduct research with, controlled substances in schedule II, III, IV, or V and shall modify the registrations of pharmacies so registered to authorize them to dispense controlled substances by means of the Internet, if the applicant is authorized to dispense, or conduct research with respect to, controlled substances under the laws of the State in which he practices. The Attorney General may deny an application for such registration or such modification of registration if the Attorney General determines that the issuance of such registration or modification would be inconsistent with the public interest. In determining the public interest, the following factors shall be considered:

(1) The recommendation of the appropriate State licensing board or professional disciplinary authority.

(2) The applicant's experience in dispensing, or conducting research with respect to controlled substances.

(3) The applicant's conviction record under Federal or State laws relating to the manufacture, distribution, or dispensing of controlled substances.

(4) Compliance with applicable State, Federal, or local laws relating to controlled substances.

(5) Such other conduct which may threaten the public health and safety.

Separate registration under this part for practitioners engaging in research with controlled substances in schedule II, III, IV, or V, who are already registered under this part in another capacity, shall not be required. Registration applications by practitioners wishing to conduct research with controlled substances in schedule I shall be referred to the Secretary, who shall determine the qualifications and competency of

A10

each practitioner requesting registration, as well as the merits of the research protocol. The Secretary, in determining the merits of each research protocol, shall consult with the Attorney General as to effective procedures to adequately safeguard against diversion of such controlled substances from legitimate medical or scientific use. Registration for the purpose of bona fide research with controlled substances in schedule I by a practitioner deemed qualified by the Secretary may be denied by the Attorney General only on a ground specified in section 824(a) of this title. Article 7 of the Convention on Psychotropic Substances shall not be construed to prohibit, or impose additional restrictions upon, research involving drugs or other substances scheduled under the convention which is conducted in conformity with this subsection and other applicable provisions of this subchapter.

...

A11

**21 U.S.C. § 823(g)**

**§ 823.  Registration requirements.**

...

(g) Research by practitioners; pharmacies; research applications; construction of Article 7 of the Convention on Psychotropic Substances

(1) The Attorney General shall register practitioners (including pharmacies, as distinguished from pharmacists) to dispense, or conduct research with, controlled substances in schedule II, III, IV, or V and shall modify the registrations of pharmacies so registered to authorize them to dispense controlled substances by means of the Internet, if the applicant is authorized to dispense, or conduct research with respect to, controlled substances under the laws of the State in which he practices. The Attorney General may deny an application for such registration or such modification of registration if the Attorney General determines that the issuance of such registration or modification would be inconsistent with the public interest. In determining the public interest, the following factors shall be considered:

(A) The recommendation of the appropriate State licensing board or professional disciplinary authority.

(B) The applicant's experience in dispensing, or conducting research with respect to controlled substances.

(C) The applicant's conviction record under Federal or State laws relating to the manufacture, distribution, or dispensing of controlled substances.

(D) Compliance with applicable State, Federal, or local laws relating to controlled substances.

(E) Such other conduct which may threaten the public health and safety.

Separate registration under this part for practitioners engaging in research with controlled substances in schedule II, III, IV, or V, who are already registered under this part in another capacity, shall not be required.

A12

(2)(A) Registration applications by practitioners wishing to conduct research with controlled substances in schedule I shall be referred to the Secretary, who shall determine the qualifications and competency of each practitioner requesting registration, as well as the merits of the research protocol. The Secretary, in determining the merits of each research protocol, shall consult with the Attorney General as to effective procedures to adequately safeguard against diversion of such controlled substances from legitimate medical or scientific use. Registration for the purpose of bona fide research with controlled substances in schedule I by a practitioner deemed qualified by the Secretary may be denied by the Attorney General only on a ground specified in section 824(a) of this title.

(B)(i) The Attorney General shall register a practitioner to conduct research with marijuana (including any derivative, extract, preparation, and compound thereof) if—

> (I) the applicant's research protocol has been reviewed and allowed—
>
>> (aa) by the Secretary of Health and Human Services under section 355(i) of this title;
>>
>> (bb) by the National Institutes of Health or another Federal agency that funds scientific research; or
>>
>> (cc) pursuant to sections 1301.18 and 1301.32 of title 21, Code of Federal Regulations, or any successors thereto; and
>
> (II) the applicant has demonstrated to the Attorney General that there are effective procedures in place to adequately safeguard against diversion of the controlled substance for legitimate medical or scientific use pursuant to section 105 of the Medical Marijuana and Cannabidiol Research Expansion Act, including demonstrating that the security measures are adequate for storing the quantity of marijuana the applicant would be authorized to possess.

(ii) The Attorney General may deny an application for registration under this subparagraph only if the Attorney General determines that the issuance of the registration would be inconsistent with the public interest. In determining the public interest, the Attorney General shall consider the factors listed in—

A13

(I) subparagraphs (B) through (E) of paragraph (1); and

(II) subparagraph (A) of paragraph (1), if the applicable State requires practitioners conducting research to register with a board or authority described in such subparagraph (A).

(iii)(I) Not later than 60 days after the date on which the Attorney General receives a complete application for registration under this subparagraph, the Attorney General shall—

(aa) approve the application; or

(bb) request supplemental information.

(II) For purposes of subclause (I), an application shall be deemed complete when the applicant has submitted documentation showing that the requirements under clause (i) are satisfied.

(iv) Not later than 30 days after the date on which the Attorney General receives supplemental information as described in clause (iii)(I)(bb) in connection with an application described in this subparagraph, the Attorney General shall approve or deny the application.

(v) If an application described in this subparagraph is denied, the Attorney General shall provide a written explanation of the basis of denial to the applicant.

(vi)(I) If the Attorney General grants an application for registration under clause (i), the registrant may amend or supplement the research protocol without notification to, or review by, the Drug Enforcement Administration if the registrant does not change—

(aa) the quantity or type of marijuana or cannabidiol (including any derivative, extract, preparation, and compound thereof);

(bb) the source of such marijuana or cannabidiol; or

(cc) the conditions under which such marijuana or cannabidiol is stored, tracked, or administered.

(II)(aa) If a registrant under clause (i) seeks to change the type of marijuana or cannabidiol (including any derivative, extract, preparation, and compound thereof), the source of such marijuana or cannabidiol, or the conditions under which such marijuana or cannabidiol is stored, tracked, or administered, the registrant shall

A14

notify the Attorney General via registered mail, or an electronic means permitted by the Attorney General, not later than 30 days before implementing an amended or supplemental research protocol.

(bb) A registrant may proceed with an amended or supplemental research protocol described in item (aa) if the Attorney General does not explicitly object during the 30-day period beginning on the date on which the Attorney General receives the notice under item (aa).

(cc) The Attorney General may only object to an amended or supplemental research protocol under this subclause if additional security measures are needed to safeguard against diversion or abuse.

(dd) If a registrant under clause (i) seeks to address additional security measures identified by the Attorney General under item (cc), the registrant shall notify the Attorney General via registered mail, or an electronic means permitted by the Attorney General, not later than 30 days before implementing an amended or supplemental research protocol.

(ee) A registrant may proceed with an amended or supplemental research protocol described in item (dd) if the Attorney General does not explicitly object during the 30-day period beginning on the date on which the Attorney General receives the notice under item (dd).

(III)(aa) If a registrant under clause (i) seeks to change the quantity of marijuana needed for research and the change in quantity does not impact the factors described in item (bb) or (cc) of subclause (I) of this clause, the registrant shall notify the Attorney General via registered mail or using an electronic means permitted by the Attorney General.

(bb) A notification under item (aa) shall include—

   (AA) the Drug Enforcement Administration registration number of the registrant;

   (BB) the quantity of marijuana or cannabidiol already obtained;

   (CC) the quantity of additional marijuana or cannabidiol needed to complete the research; and

   (DD) an attestation that the change in quantity does not impact the source of the marijuana or cannabidiol or the conditions under which the marijuana or cannabidiol is stored, tracked, or administered.

A15

(cc) The Attorney General shall ensure that—

(AA) any registered mail return receipt with respect to a notification under item (aa) is submitted for delivery to the registrant providing the notification not later than 3 days after receipt of the notification by the Attorney General; and

(BB) notice of receipt of a notification using an electronic means permitted under item (aa) is provided to the registrant providing the notification not later than 3 days after receipt of the notification by the Attorney General.

(dd)(AA) On and after the date described in subitem (BB), a registrant that submits a notification in accordance with item (aa) may proceed with the research as if the change in quantity has been approved on such date, unless the Attorney General notifies the registrant of an objection described in item (ee).

(BB) The date described in this subitem is the date on which a registrant submitting a notification under item (aa) receives the registered mail return receipt with respect to the notification or the date on which the registrant receives notice that the notification using an electronic means permitted under item (aa) was received by the Attorney General, as the case may be.

(ee) A notification submitted under item (aa) shall be deemed to be approved unless the Attorney General, not later than 10 days after receiving the notification, explicitly objects based on a finding that the change in quantity—

(AA) does impact the source of the marijuana or cannabidiol or the conditions under which the marijuana or cannabidiol is stored, tracked, or administered; or

(BB) necessitates that the registrant implement additional security measures to safeguard against diversion or abuse.

(IV) Nothing in this clause shall limit the authority of the Secretary of Health and Human Services over requirements related to research protocols, including changes in—

(aa) the method of administration of marijuana or cannabidiol;

(bb) the dosing of marijuana or cannabidiol; and

A16

(cc) the number of individuals or patients involved in research.

(3) Article 7 of the Convention on Psychotropic Substances shall not be construed to prohibit, or impose additional restrictions upon, research involving drugs or other substances scheduled under the convention which is conducted in conformity with this subsection and other applicable provisions of this subchapter.

...

**Pub. L. No. 115-176 (excerpts)**

…

§ 3.  Sense of the Senate.

It is the sense of the Senate that section 561B of the Federal Food, Drug, and Cosmetic Act, as added by section 2—

> (1) does not establish a new entitlement or modify an existing entitlement, or otherwise establish a positive right to any party or individual;
>
> (2) does not establish any new mandates, directives, or additional regulations;
>
> (3) only expands the scope of individual liberty and agency among patients, in limited circumstances;
>
> (4) is consistent with, and will act as an alternative pathway alongside, existing expanded access policies of the Food and Drug Administration;
>
> (5) will not, and cannot, create a cure or effective therapy where none exists;
>
> (6) recognizes that the eligible terminally ill patient population often consists of those patients with the highest risk of mortality, and use of experimental treatments under the criteria and procedure described in such section 561A involves an informed assumption of risk; and
>
> (7) establishes national standards and rules by which investigational drugs may be provided to terminally ill patients.